## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ————————————————— ) <br> **Service Employees International Union** ) <br> **National Industry Pension Fund, et al.** ) <br> ) <br>    **Plaintiffs,** ) <br> ) <br>       **v.** ) <br> ) <br> **Liberty House Nursing Home of** ) <br> **Jersey City, Inc.,** ) <br> ) <br>    **Defendant.** ) <br> ————————————————— ) | **Case No. 16-cv-01375 (APM)** |

## <u>MEMORANDUM OPINION</u>

### I.   INTRODUCTION

Plaintiff Service Employees International Union National Industry Pension Fund (the "Pension Fund") is a multiemployer pension plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. Defendant Liberty House Nursing Home of Jersey City, Inc., which formerly operated a nursing home in Jersey City, New Jersey, is a participating employer in the Pension Fund. The Pension Fund and its Trustees (collectively, "Plaintiffs") brought this action under ERISA, alleging that Defendant made deficient and late payments under the pension plan, underreported employees' salaries in monthly reports used to calculate employer contributions, and neglected to make withdrawal liability payments, which are assessed when an employer prematurely withdraws from a plan. Plaintiffs sought deficient and late contributions, withdrawal liability, liquidated damages, surcharges owed under the Pension Protection Act of 2006, Pub. L. No. 109–280, 120 Stat. 780 (2006), interest, and attorney's fees and costs.

Although properly served, Defendant failed to respond to the Complaint, and the Clerk of the Court entered default on August 23, 2016. Plaintiffs then moved for default judgment, seeking the relief requested in the Complaint. For the reasons discussed below, the court grants Plaintiffs' Motion for Default Judgment.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   *Contractual History*

At all times relative to this action, Service Employees International Union Healthcare 1199 New Jersey (the "Union") was the collective bargaining representative for full-time and part-time caregiver and healthcare employees at Defendant's nursing home in Jersey City, New Jersey. Compl., ECF No. 1 [hereinafter Compl.], at 3–4. In March 2008, the Union entered into a collective bargaining agreement (the "2008 Agreement") with Defendant and several other nursing homes that governed the period from March 13, 2008, through February 28, 2013. *Id.*; Compl., Ex. 1, ECF No. 1-3 [hereinafter 2008 Agreement]; Pls.' Mot. for Default J., ECF No. 7 [hereinafter Pls.' Mot.], Decl. of Kenneth J. Anderson, Jr., ECF No. 7-3 [hereinafter Anderson Decl.], ¶ 4. In 2012, the Union reopened negotiations with the employers over the terms of the agreement for its final year, which it was authorized to do under the agreement,[1] but after both sides failed to reach a resolution, the parties submitted the matter to arbitration. Compl., Ex. 2, ECF No. 1-4 [hereinafter 2012 Agreement], at 2.[2] In November 2012, an arbitrator who was authorized by the agreement to issue a final and binding resolution imposed a collective bargaining agreement on the parties, effective from March 1, 2012, through June 30, 2016 (the "2012 Agreement"). Anderson Decl. ¶ 4; 2008 Agreement art. 34, § 1; 2012 Agreement at 13.

---

[1] Under Article 34 of the 2008 Agreement, "The Union shall have the right ninety (90) days prior to February 28, 2012 to reopen and negotiate wages (minimum and across the board increases), hours and general terms and

[2] Unless otherwise noted, pin citations are to the document's original pagination.

Under the 2008 Agreement, Defendant agreed to contribute 1.5 percent of each covered employee's gross monthly wages to the Pension Fund starting in 2008.   Compl. at 4; 2008 Agreement, art. 30, § 3.   That contribution amount subsequently increased in 2010 and 2011 to 2.5 percent and 2.75 percent, respectively.   2008 Agreement, art. 30, § 3.   The 2012 Agreement provides that Defendant would make contributions at a rate of 2.75 percent of employees' gross earnings for the duration of the contract.   2012 Agreement at 22.

The 2008 and 2012 Agreements state that participating employers are bound by the Pension Fund's Agreement and Declaration of Trust ("Trust Agreement") as well as its Statement of Policy for Collection of Delinquent Contributions ("Collections Policy").   2008 Agreement; 2012 Agreement; Compl., Ex. 3, ECF No. 1-5 [hereinafter Trust Agreement]; Compl., Ex. 4, ECF No. 1-6 [hereinafter Collections Policy].

## 2.   *The Rehabilitation Plan*

As a result of investment losses in 2008, the Pension Fund was deemed to be in "critical status" each year from 2009 through 2016.[3]   Anderson Decl. ¶¶ 6–8; Anderson Decl., Ex. A, ECF No. 7-3, at 13–82 [hereinafter Annual Funding Notices], at 79.   In response, the Pension Fund's trustees adopted a Rehabilitation Plan in November 2009, designed to improve the fund's fiscal situation.   Under the Rehabilitation Plan, participating employers, such as Defendant, were required to pay surcharges and supplemental contributions under one of two schedules—either a "Default" or "Preferred" Schedule.   Anderson Decl. ¶¶ 6–8; Annual Funding Notices at 79.   The Pension Fund communicated these changes to participating employers each year from 2009 through 2016, notifying them by letter of the Pension Fund's critical status and the Rehabilitation Plan.   *See* Annual Funding Notices.   These letters also listed the applicable surcharges.   *Id.*

---

[3] Under federal pension law, a plan generally will be considered to be in "critical status" if, by certain statutorily defined measures, the plan's funding is too low.   *See* 26 U.S.C. § 432.

Defendant, as part of the 2012 Agreement, agreed to pay supplemental contributions effective July 1, 2010, under the Preferred Schedule.  2012 Agreement at 19; Anderson Decl. ¶ 10.

### 3.     The Pension Fund's Assessment of Withdrawal Liability

On June 30, 2015, the Pension Fund sent a notice and demand for payment to Defendant based on its determination that Defendant had completely withdrawn from the plan as of February 28, 2015, thereby triggering withdrawal liability under 29 U.S.C. §§ 1382 and 1383(a). Anderson Decl., Ex. E, ECF No. 7-3 [hereinafter Withdrawal Liability Assessment]; Anderson Decl. ¶ 23.  The Pension Fund assessed $844,789.39 in provisional withdrawal liability.  *See* Withdrawal Liability Assessment.

On August 17, 2015, Defendant requested review of the Pension Fund's determination under Section 4219(b)(2)(A) of ERISA, 29 U.S.C. § 1399(b)(2)(A).  Compl., Ex. 9, ECF No. 1-11 [hereinafter Request for Review], at 1; Anderson Decl. ¶ 26.  Defendant argued that there was "no permanent cessation of [its] obligation to contribute" because its withdrawal from the plan fell under ERISA Section 4218(1)(A), which exempts from withdrawal liability employers who withdraw solely because of a change in business form that "causes no interruption in employer contributions or obligations to contribute under the plan."  *See* 29 U.S.C. § 1398; Request for Review at 1–2.  The Pension Fund responded to Defendant's request for review and rejected its objection.  Compl., Ex. 10, ECF No. 1-12 [hereinafter Letter to Liberty House].

On November 16, 2016, Plaintiffs filed in this case a supplemental memorandum calculating Defendant's final withdrawal liability to be $1,187,325.97.  *See* Pls.' Supp. Mem. in Support of Mot. for Default J., ECF No. 8 [hereinafter Pls.' Supp. Mem.]; Pls.' Supp. Mem., Decl. of Kisha Smith, ECF No. 8-1 [hereinafter Smith Decl.], ¶¶ 2–3.

4. *The Audit*

Pursuant to the Pension Fund's Collections Policy, the Pension Fund conducted an audit of Defendant for the calendar years 2012 and 2013.   The audit aimed to verify that the hours and salaries reported by Defendant to calculate monthly contributions were the same as those reflected in Defendant's payroll documents and federal tax filings.   *See* Pls.' Mot., Decl. of Andre Joseph, ECF No. 7-4 [hereinafter Joseph Decl.], ¶ 10.   The audit revealed that Defendant underreported employee salaries in 2012 and 2013.   *Id.* ¶¶ 10–12.   In letters dated November 20, 2015, and January 14, 2016, the Pension Fund notified Defendant of the findings of the audit and Defendant's obligation to pay the missing contributions.   *Id.* ¶ 13; Joseph Decl., Ex. A, ECF No. 7-4, at 9–10.   According to Andre Joseph, Payroll Review Manager for the Union, as of October 21, 2016, Defendant had "failed or refused to remit the amounts owed to the Pension Fund under the audit."   Joseph Decl. ¶ 13.

**A.    Procedural Background**

On June 29, 2016, Plaintiffs filed a Complaint alleging that Defendant breached the 2008 and 2012 Agreements and violated ERISA by failing to make timely and complete contributions to the plan between October 2012 and February 2015; underreporting employee salaries in 2012 and 2013, and, thereby, underpaying contributions during that time period; and defaulting on withdrawal liability payments after Defendant withdrew from the plan.   *See* Compl. at 12–13. Plaintiffs sought various forms of relief, including: (1) a declaration that Defendant defaulted on withdrawal liability payments to the Pension Fund; and (2) a judgment requiring Defendants to pay withdrawal liability, delinquent contributions, liquidated damages, surcharges owed under the Pension Protection Act, interest, and attorney's fees and costs.   *Id.* at 14–15.

Defendant failed to respond to the Complaint within 21 days, and the Clerk filed an entry of default on August 23, 2016.  *See* Clerk's Entry of Default, ECF No. 5.  On October 21, 2016, Plaintiffs then filed the Motion for Default Judgment presently before the court.  *See* Pls.' Mot.

## III.   LEGAL STANDARD

A party seeking a default judgment must undertake a two-step process, as set forth in Rule 55 of the Federal Rules of Civil Procedure.  First, a plaintiff must ask the Clerk of the Court to enter a default against a party who has "failed to plead or otherwise defend" itself against the action.  Fed. R. Civ. P. 55(a).  Once an entry of default is on the docket, the plaintiff must move for entry of a default judgment.  Fed. R. Civ. P. 55(b).  Entering a default judgment is not a task courts take lightly, or one to which the moving party is automatically entitled.  *See Carpenters Labor-Mgmt. Pension Fund v. Freeman-Carder LLC*, 498 F. Supp. 2d 237, 240 (D.D.C. 2007).  Instead, a "default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party."  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (internal quotation marks omitted).

Although a default judgment establishes a defendant's liability, the Court must "make an independent determination of the sum to be awarded" pursuant to the judgment "unless the amount of damages is certain."  *Boland v. Yoccabel Const. Co.*, 293 F.R.D. 13, 17 (D.D.C. 2013).  To determine the appropriate amount of damages, the court may hold a hearing or it may "rely on detailed affidavits or documentary evidence."  *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 68 (D.D.C. 2011).  A plaintiff "must prove these damages to a reasonable certainty."  *Id.*

## IV.    DISCUSSION

### A.    Jurisdiction

As an initial matter, the court holds that it has personal jurisdiction over Defendant. ERISA contains a special venue provision, Section 502(e)(2), which states that an ERISA action may be brought "in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2).  "ERISA's venue provision has been interpreted to authorize nationwide service of process."  *Mazzarino v. Prudential Ins. Co. of Am.*, 955 F. Supp. 2d 24, 28 (D.D.C. 2013) (internal quotation marks omitted).  When a statute allows for nationwide service of process, the defendant need not have minimum contacts with the forum state for personal jurisdiction over the defendant to exist in that state.  *See Teamsters Local 639 Emp'rs, Health Trust v. Hileman*, 988 F. Supp. 2d 18, 25–26 (D.D.C. 2013).  "Under a nationwide service of process provision, minimum contacts with the United States suffice" to create personal jurisdiction.  *Mazzarino*, 955 F. Supp. 2d at 28.  As a company operating a nursing home in New Jersey, Compl. at 3, Defendant quite obviously has sufficient minimum contacts with the United States to give rise to personal jurisdiction in this court.  *See Flynn v. Ohio Bldg. Restoration, Inc.*, 260 F. Supp. 2d 156, 173 (D.D.C. 2003) (holding that ERISA's nationwide service provision permits the court to exercise jurisdiction over Defendant "because it is a citizen of the United States").

### B.    Whether Entry of Default is Warranted

In considering Plaintiffs' Motion, the court first must determine whether entry of a default judgment is warranted.  *See Jackson*, 636 F.2d at 836; *Teamsters Local 639–Emp'rs Health Trust v. Boiler & Furnace Cleaners, Inc.*, 571 F. Supp. 2d 101, 107 (D.D.C. 2008). "To warrant a default judgment, the defendant must be considered a totally unresponsive party, and

its default plainly willful, reflected by its failure to respond to the summons and complaint, the entry of a default, and the motion for a default judgment." *Teamsters Local 639*, 571 F. Supp. 2d at 107 (internal quotation marks omitted).

That standard is met here. Defendant failed to respond to Plaintiffs' Complaint and has not taken any other action indicating an intent to defend itself in this matter. Accordingly, the court finds that entry of a default judgment is appropriate.

### C.     Delinquent Contributions

When entering a default judgment, the court must make an independent evaluation of the sum to be awarded unless the damages are certain. *Adkins*, 180 F. Supp. 2d at 17. Under Section 515 of ERISA, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. In an action concerning delinquent contributions, ERISA directs the court to award a plan:  (1) the unpaid contributions; (2) interest on the unpaid contributions; (3) an amount equal to the greater of either interest on the unpaid contributions or liquidated damages; (4) reasonable attorney's fees and costs; and (5) other appropriate relief.  *Id.* § 1132(g)(2). "The unpaid contributions, interest, and liquidated damages are considered 'sums certain,' because their calculations are mandated by ERISA and party agreements." *Yoccabel Const. Co.*, 293 F.R.D. at 18; *see also Flynn v. Mastro Masonry Contractors*, 237 F. Supp. 2d 66, 70 (D.D.C. 2002). On the other hand, attorney's fees are not considered a "sum certain" because the reasonableness of the fees is a "'judgment call' which only the Court can make." *Combs v. Coal & Mineral Mgmt. Servs., Inc.*, 105 F.R.D. 472, 475 (D.D.C. 1984).

*1.     Late Payment and Underpayment of Employer Contributions*

Plaintiffs contend that Defendant owes interest and liquidated damages for prior late payment and underpayment of contributions between October 2012 and February 2015. Anderson Decl. ¶ 12.  To support their claim for interest and liquidated damages, Plaintiffs provide an affidavit from Kenneth J. Anderson, Jr., Contribution Compliance Manager with the Fund.  Anderson Decl. ¶ 1.  In his declaration, Anderson explains that Defendant owes $4,341.04 in interest and liquidated damages—$3,506.50 in liquidated damages and $834.43 in interest, less an overpayment of $407.89—for late payment and underpayment of contributions during the relevant time period.  *Id.* ¶¶ 12, 17.

Interest in this case is mandated by the parties' agreements.  *See* 29 U.S.C. § 1132. ("[I]nterest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under [26 U.S.C. 6621].").  The Pension Fund's Trust Agreement and its Collections Policy provide that an employer delinquent in contributions is liable for interest in the amount of 10 percent per year, as well as liquidated damages.  *See* Collections Policy § 5; Anderson Decl. ¶¶ 14–16.  Liquidated damages are calculated as the greater of the interest on the delinquent contributions or 20 percent of the delinquent contributions.  *See* Collections Policy § 5; Anderson Decl. ¶¶ 16. .

Based on the affidavit and plan documents, the court finds that Plaintiffs are entitled to an award of $4,341.04 in interest and liquidated damages for prior late payment and underpayment of contributions between October 2012 and February 2015.

*2.     Amounts Owed Under the Audit*

Plaintiffs further claim that an audit revealed unpaid contributions by Defendant in 2012 and 2013.  Joseph Decl. ¶ 12.  Plaintiffs maintain that Defendant underreported employees'

salaries in 2012 and 2013, which led Defendant to pay lower monthly contributions.  Plaintiffs seek a default judgment in the amount of $91,694.24 in unpaid contributions, surcharges owed under the Pension Protection Act of 2006 ("PPA surcharges"), interest, liquidated damages, and testing fees.  Pls.' Supp. Mem. at 2.

Under the Pension Fund's Trust Agreement and Collections Policy, employers self-report employee hours each month to the Pension Fund and that information is used to calculate an employer's monthly contributions to the plan.  *See* Joseph Decl. ¶¶ 4, 6.  In its monthly report, an employer must list the names of each employee and the number of hours compensable under the plan or amounts paid in salaries for each employee.  *Id.* ¶ 5.  The Collections Policy provides that the Pension Fund may audit any participating employer to verify that the hours and salaries in the monthly reports are the same as those reflected in the employer's payroll documents and federal tax filings.  *Id.* ¶ 7.  The Policy further provides that if an audit reveals an underpayment, the employer is liable for the underpaid contributions, liquidated damages, interest, testing fees— which include the auditor's time and expenses in performing the payroll review—and attorney's fees.  Collections Policy §§ 4.7, 4.10.

Pursuant to this policy, the Pension Fund audited Defendant's books for the calendar years 2012 and 2013, which revealed discrepancies between the salaries Defendant reported and the salaries Defendant paid during that time period.  Joseph Decl. ¶¶ 10, 11, 14.  Plaintiffs rely on the Joseph Affidavit to support their claim for a default judgment in the amount due for the underreported salaries uncovered by the audit.  Joseph attests that, pursuant to the audit and plan documents, Defendant owes $47,267.94 in contributions; $10,987.92 in supplemental contributions—which are owed because the Fund was in critical status during that time period; $1,146.44 in Pension Protection Act surcharges; $14,043.14 in interest through January 15,

2016; $2,363.40 in liquidated damages; and $1,221.19 in testing fees.  *Id*. ¶ 10; Collections

Policy § 4.10.  Plaintiffs later revised the total amount owed to incorporate interest calculated

through October 21, 2016, and now seeks a default judgment in the amount of $91,694.24 for

Defendant underreporting employee salaries in 2012 and 2013.  Pls.' Supp. Mem., at 2; Joseph

Decl. ¶ 12.

Based on the Joseph Declaration and plan documents, the court finds that Plaintiffs are

entitled to $91,694.24 in unpaid contributions, supplemental contributions, PPA surcharges,

interest, liquidated damages, and testing fees for underreporting employees' salaries during 2012

and 2013, as revealed by the audit.

### D.    Withdrawal Liability

ERISA provides that an employer who withdraws from a multiemployer plan is liable to

make payments to the plan for its share of unfunded vested benefits.  29 U.S.C. §§ 1381, 1391.

According to Section 4203(a) of ERISA, an employer completely withdraws from a plan when it

"(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently

ceases all covered operations under the plan."  29 U.S.C. § 1383(a).  Once an employer

withdraws from a plan, the plan sponsor—such as a joint board of trustees or other group of

representatives of the employers—must determine the amount of the employer's withdrawal

liability, notify the employer, and collect withdrawal liability.  29 U.S.C. §§ 1382, 1002(16)(B).

Plaintiffs seek a default judgment for withdrawal liability owed by Defendant, as well as interest

and liquidated damages, in the amount of $1,187,325.97.  Pls.' Mot., Pls.' Mem. in Supp., ECF

No. 7-1 [hereinafter Pls.' Mem.], at 13–15; Pls.' Supp. Mem., at 2.  The court finds that

Defendant withdrew from the plan.  Plaintiffs are entitled to a default judgment for withdrawal

liability, plus interest and liquidated damages.

11

*1.      Whether Defendant Completely Withdrew from the Plan*

According to Plaintiffs, Defendant "complete[ly]" withdrew from the plan, within the meaning of Section 4203(a) of ERISA, as of February 28, 2015.  Pls.' Mem. at 14; Anderson Decl. ¶ 23.   However, neither the Complaint's allegations nor Plaintiffs' supporting affidavits provide sufficient facts for the court to reach that conclusion.  Nonetheless, other facts within the record, as well as judicially noticeable facts, support a finding that Defendant is subject to withdrawal liability.

Plaintiffs' Complaint attaches a letter that describes the events leading to Defendant's cessation of operations.  Letter to Liberty House.  That letter, in turn, cites to a New Jersey appellate court decision, *Liberty House Nursing Home of Jersey City, Inc. v. GRE Jersey City, Inc.*, which sets forth adjudicated facts concerning the same events as are at issue in this case. *See* No. A-0206-11T1, 2013 WL 1187838 (N.J. Super. Ct. App. Div. Mar. 22, 2013), *cert. granted by* 73 A.3d 509 (mem.) (N.J. 2013), *and appeal dismissed as improvidently granted by* 103 A.3d 264 (mem.) (N.J. 2014).   The court takes judicial notice of those adjudicated facts. *See, e.g.*, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (recognizing that a court's "ability to take notice of adjudicative facts extends to judicial notice of court records in related proceedings").[4]

In 2010, Defendant's landlord, GRE Properties Jersey City, Inc. ("GRE"), notified Defendant that it would have to quit the premises because the parties had not come to terms on an extension of the lease.  *See Liberty House Nursing Home of Jersey City*, 2013 WL 1187838, at *3 (N.J. Super. Ct. App. Div. Mar. 22, 2013).  That notice led to litigation between Defendant

---

[4] The court also takes judicial notice of a February 27, 2015, news article in The Jersey Journal, which states that GRE Jersey City Inc., would take over operations of Liberty House on March 1, 2015, following litigation in which GRE won control of the nursing home's operations.  Patrick Villanova, *Jersey City nursing home workers will head to work Sunday unsure if they still have jobs*, THE JERSEY JOURNAL (Feb. 27, 2015), http://www.nj.com/hudson/index.ssf/2015/02/nursing_home_workers_face_uncertain_future_at_jers.html.

and GRE over two issues:  (1) whether GRE had lawfully terminated Defendant's lease, and (2) which party was the rightful owner of the "bed rights"—the authorization to operate a health care facility with a particular number of beds—at the facility.  *See id.* at *3–4.  A New Jersey state trial court determined that GRE had validly terminated Defendant's lease and that GRE was the sole owner of the facility's "bed rights," meaning only GRE had the legal right to operate the nursing home.  *Id.* at *3.  In 2013, the Appellate Division of the New Jersey Superior Court affirmed the trial court's decision.  *Id.* at *1.  After Defendant exhausted the issues on appeal, GRE took over operations of the nursing home in 2015.  *See id.* at *3 n.5.

On June 30, 2015, the Pension Fund sent a notice to Defendant stating that Defendant completely withdrew from the plan as of February 28, 2015, and assessing $844,789.39 in provisional withdrawal liability.  Withdrawal Liability Assessment; Anderson Decl. ¶ 23. Defendant requested a review of the Pension Fund's determination, claiming that it qualified for an exemption under ERISA Section 4218(1)(A), which exempts from withdrawal liability employers who withdraw solely because of a change in business form if it "causes no interruption in employer contributions or obligations to contribute under the plan."  29 U.S.C. § 1398; Request for Review.

The Pension Fund disagreed.  It concluded that GRE was not merely a new corporate form of Defendant, but as evidenced by the litigation, the two were separate entities and that "Liberty House's loss of its lease of the premises and license to operate a nursing home to GRE did not change Liberty House's corporate structure or serve to create a merger between the two entities." Letter to Liberty House at 2–3.  Accordingly, the Pension Fund maintained that Defendant was responsible for payment of withdrawal liability.

Based on the foregoing facts, the court agrees with the Pension Fund's determination that, upon Defendant's cessation of the facility's operations and GRE's assumption of those operations, Defendant had completely withdrawn from the plan.  *See* 29 U.S.C. §§ 1383(a)(2) (defining a "complete withdrawal" to include "when an employer . . . permanently ceases all covered operations under the plan").  GRE was not a successor corporation or entity that would have excused Defendant from withdrawal liability under 29 U.S.C. § 1398.  Accordingly, the court finds that Defendant was required to make withdrawal liability payments under 29 U.S.C. § 1399.

### 2. *Withdrawal Liability Amount*

A participating employer's liability for prematurely withdrawing from a multiemployer plan is the sum of the unamortized balances of the employer's prorated shares, as of the end of the plan year preceding withdrawal.  Pls.' Supp. Mem. at 1; Smith Decl. ¶ 2; Compl., Ex. 11, ECF No. 1-13 [hereinafter Pension Plan], § 10.03(a).  Here, Defendant's withdrawal liability is based on the sum of the unamortized balances of Defendant's prorated shares from 2002 to 2014—from the year Defendant joined the plan to the year preceding withdrawal.  Smith Decl. ¶ 4; Smith Decl., Ex. A, ECF No. 8-1 at 6.  Plaintiffs calculated the final withdrawal liability amount Defendant owes to be $802,014.04, before interest and liquidated damages.  Pls.' Supp. Mem. at 2; Smith Decl. ¶ 5.  The court finds that Plaintiffs have submitted sufficient evidence to establish withdrawal liability in that amount.

### 3. *Interest*

Under Section 10.05(d)(2) of the pension plan, an employer who defaults on withdrawal liability must pay interest in the amount of the prime rate as published in the *Wall Street Journal* on the first business day of the calendar year in which the payment was due, plus two percent.

Pension Plan § 10.05(d)(2).  That amount will adjust each year thereafter based on the current prime rate, according to the *Wall Street Journal*, plus two percent.  *Id.*; Anderson Decl. ¶ 29. Plaintiffs seek interest in the amount of $224,909.12.[5]

After reviewing the plain language of the parties' agreements, Plaintiffs' submissions, and Plaintiffs exhibits, the court concludes Plaintiffs are entitled to $224,909.12 in interest on the withdrawal liability owed.

### 4.    Liquidated Damages

Further, the plan provides that, if the court awards a judgment in favor of the plan in a suit over withdrawal liability, then the employer must pay liquidated damages of whichever is greater:  (1) the amount of interest charged on the unpaid balance; or (2) 20 percent of the unpaid amount to be awarded.   Pension Plan § 10.05(e); Anderson Decl. ¶ 30; Smith Decl. ¶ 5. According to Smith's declaration, this amount is $160,402.81, or 20 percent of the unpaid amount to be awarded.   The court concludes that Plaintiffs are entitled to $160,402.81[6] in liquidated damages.

Based on the affidavits, the statutory provisions, and the evidence in the record, the court finds that Plaintiffs are entitled to $1,187,325.97 in final withdrawal liability, interest, and liquidated damages.

### E.    Attorney's Fees

Plaintiffs have also requested $10,141 in attorney's fees and costs.   In support of this request, they submit a declaration from Olga Metelitsa, an associate at Mooney, Green, Saindon,

---

[5] Plaintiffs did not specify the amount of interest sought in their filings to the court, and it is not set forth in their exhibits.  Accordingly, the court calculated interest by subtracting the principal and liquidated damages from the total amount of withdrawal liability sought.  *See* Pls.' Supp. Mem. at 2 n.1 ("[T]he interest sought for the withdrawal liability principal upon default judgment is equal to the prime rate plus 2% in the Wall Street Journal on the first business day of the calendar year in which the payment was due.  The separate interest that would be collectively due under a 240-month installment plan is not sought here.").

[6] Although this amount is less than the interest owed on the unpaid balance, because Plaintiffs have requested this sum certain, the court awards only that amount.

Murphy & Welch, P.C., who served as Plaintiffs' counsel in this litigation.  Pls.' Supp. Mem. at 2; Decl. of Olga Metelitsa, ECF No. 7-5 [hereinafter Metelitsa Decl].  The Metelitsa Declaration states that Plaintiffs have incurred $10,141 in attorney's fees and costs.

Plaintiffs are entitled to "reasonable" attorney's fees and costs.  29 U.S.C. § 1132(g)(2)(D); *Combs*, 105 F.R.D. at 474.  "In the preparation of fee applications it is insufficient to provide the District Court with very broad summaries of work done and hours logged."  *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982) (per curiam).  "The better practice is to prepare detailed summaries based on contemporaneous time records indicating the work performed by each attorney for whom fees are sought."  *Id*.  A very broad summary, however, is all that Plaintiffs have provided to the court.

In a two-page affidavit, Plaintiffs provide the names of the attorneys that worked on the case, their total hours spent on the case, a one-sentence summary of all the work performed, and the billing rates of the attorneys and paralegals.  Metelitsa Decl.  *See* Pls.' Mem. at 12–13.  This will not suffice.  The bare bones affidavit is not "sufficiently detailed to permit the District Court to make an independent determination whether or not the hours claimed are justified." *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1327.  The affidavit does not, for example, specify the hours spent on a particular task or who performed that task.  Absent such details, the court cannot determine at this time whether the charges are reasonable.

Accordingly, within 14 days of this date, Plaintiffs shall submit a "detailed summary" of the work performed by its counsel "based on contemporaneous time records indicating the work performed by each attorney for whom fees are sought."  *Id*.  Any such detailed summary shall be

accompanied by counsel's monthly invoices to Plaintiffs.  Any privileged portion of the monthly invoices may be redacted, with the unredacted invoice provided to the court in camera.

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Default Judgment is granted.  The court finds that Plaintiffs are entitled to $4,341.04 in interest and liquidated damages for prior late payment and underpayment of employer contributions; $91,694.24 in unpaid contributions, PPA surcharges, interest, liquidated damages, and testing fees pursuant to an audit; and $1,187,325.97 in withdrawal liability, interest, and liquidated damages.

The court will enter a final attorney's fees and costs award after the court receives more detailed information supporting the request for fees and costs.

A separate Order accompanies this Memorandum Opinion.


Dated:  February 8, 2017                                    Amit P. Mehta
                                                            United States District Judge